James R. YOCOM, Commissioner of Labor, etc., Appellant,

v.

David SPALDING et al., Appellees.

David SPALDING, Appellant,

v.

STIMPSON SCALE COMPANY et al., Appellees.

Supreme Court of Kentucky.

Jan. 14, 1977.

Rehearing Denied April 1, 1977.

Robert L. Catlett, Jr., Segal, Isenberg, Sales, Stewart & Nutt, Louisville, Timothy P. O'Mara, Asst. Counsel, Dept. of Labor, Louisville, Kenneth E. Hollis, Gen. Counsel, Dept. of Labor, Frankfort, for appellants.

William D. Grubbs, Will H. Fulton, Woodward, Hobson & Fulton, Louisville, for appellees.

PALMORE, Justice.

The appellant David Spalding claims workmen's compensation benefits by reason of an injury to one of his eyes. The board found him totally disabled, 90% from the accident and 10% from a pre-existing congenital condition, and made an award on the basis of the 90% portion against the employer alone, absolving the Special Fund. The employer appealed to the circuit court, which remanded the proceeding to the board with directions to make a new award against the employer "not to exceed eleven percent (11%) of the appropriate scheduled

benefit and an award against the Special Fund in an amount not to exceed twenty-five percent (25%) permanent partial disability as a result of the pre-existing condition," citing KRS 342.120(1)(a). The claimant and the Special Fund thereupon appealed to this court.

At the time of the accident, September 28, 1973, Spalding was 22 years old and lacked a half credit of finishing high school at Springfield, Kentucky. He had left Springfield and found employment in Louisville with the appellee, Stimpson Scale Company, as a "grinder polisher and production worker." While he was using a hand file to smooth the spokes of a metal ring a small piece of metal got into his left eye. Three days later he was seen by Dr. Daniel W. Burke, an ophthalmologist, who observed "a foreign body and a rust stain secondary to the foreign body deeply embedded in his cornea." Dr. Burke began at once to remove this foreign material from the eye but deferred completing the job until the next day because he "was getting quite deep into the cornea." He finished removing the rust on the next day and saw the patient again on each of the next three days and on several occasions thereafter. It was the doctor's opinion that the wound healed normally but left a scar, "a little pit or little indentation in the clear part of the eye." Nevertheless, Spalding complained of one thing and then another. At first he continued to have the sensation of a foreign body in the eye, then he complained of glare and headaches, and after the employer had transferred him to its shipping department he found that he had to use a magnifying glass in order to read numbers on the scales and charts. He says that when he tries to read for any length of time without glasses his eyes begin to burn and water.

We come now to the complicating factor in the case. It appears that from birth the claimant's eyes did not focus properly, which condition, left untended, resulted in his right eye's becoming what is called a "lazy eye," in that it became permanently useless except to distinguish light from

dark. Hence for practical purposes he had only one serviceable eye, the left eye. That eye, the good one, had not been tested recently for visual acuity prior to the injury, though Spalding himself testified that his vision had been perfect and that he had never worn glasses. After the corneal wound had healed Dr. Burke found the visual acuity of the left eye, without glasses, to be 20/40, whereupon he fitted the eye with a corrective contact lens but later switched to ordinary spectacles when it appeared that the patient could not or would not tolerate the contact lens. At the last visit Dr. Burke found the visual acuity of the left eye to be 20/50 without and 20/40 with glasses. Using the glasses Spalding can read newspapers and was able to do the work in Stimpson's shipping department.

Spalding was laid off on May 31, 1974, when a strike at a supplier's plant resulted in a shortage of necessary materials in Stimpson's manufacturing operation. He found other employment with an office supply firm, but was assigned to relatively menial work at a salary of $2.50 per hour as compared with the $3.50 per hour he had been earning at Stimpson.

█ In assessing percentage of disability Dr. Burke resorted to a chart that classifies physical impairment according to visual loss. He said that the loss of or absence of vision in one eye represents a 30% impairment in over-all visual efficiency and that 20/50 vision in one eye is 25% less than the visual efficiency of a 20/20 eye. According to the chart, and on the premise that Spalding had a visual efficiency of 70% before the accident and suffered a 25% loss of vision in the left eye by reason of the injury, he now has a visual efficiency of 59%, or 11% less than he had immediately prior to the accident. This evidently was the basis for the circuit court's order that the award against Stimpson be limited to 11% partial disability. It is to be noted, however, that Dr. Burke neither sought nor was asked to translate this functional impairment in terms of occupational disability.

Hence the trial court's action in that respect was erroneous.

Dr. Sheldon B. Schiller, another qualified ophthalmologist, examined Spalding on May 3, 1974, pursuant to an appointment by the board and was the only other medical witness. Upon initial examination through the reading of letters on a chart from a distance of 20 feet, the vision in Spalding's left eye appeared to be 20/70, but after the pupil had been dilated it was 20/25, or virtually normal. In explanation, Dr. Schiller testified that there ought not to be a difference, but that the test given after dilation is the more objective, because the patient is looking through a machine and does not know which line he is reading or attempting to read, whereas in the simple reading test from 20 feet he may have "just read a line that he casually felt that he should read before we put the drops in, or by design, he was trying to give me a line that was worse than he could read." Dr. Schiller observed the small corneal scar in the left eye but regarded it as "insignificant with relation to his vision. There's no way that spot could cause a loss of vision. It's like having a mosquito on your windshield . . .. This spot would have nothing to do with the field of vision. It's like putting a speck on your glasses, really, and you may not even find the speck if you put it on your glasses. The speck is in the corner and only a few millimeters from your cornea.[1] That spot is not going to cause him any loss of vision or going to cause any loss of field."

Dr. Schiller was of the further opinion that the absence of vision in one eye represents a 25% functional loss to the body as a whole but is not occupationally disabling "unless you find some unusual occupation that would require specifically binocular vision; and a laboring type of job should not offer the least bit of problem."

█ So there we have it. Obviously there was no reasonable basis for the board's finding that Spalding is 100% occupationally disabled. Though it has broad leeway within the province of factfinding

1. Presumably the doctor meant the *surface* of the cornea.

to translate functional into occupational disability, that authority is not unlimited. By no stretch of the imagination can it be said that this man, who continues to be regularly employed, is totally disabled. Cf. *Winn Dixie Louisville, Inc. v. Watson,* Ky., 473 S.W.2d 148 (1971). To the extent, therefore, that the order of the circuit court remanded the matter to the board for reassessment of the degree of partial disability it was entirely justified.

■ On the other hand, we perceive no good reason for requiring the board to reconsider the degree of disability pre-existing the injury. Dr. Burke expressed the opinion that the useless right eye represented a functional impairment of 30%, though he did not undertake to say whether and to what extent that deficiency was occupationally disabling. Dr. Schiller estimated the functional impairment at 25% but regarded it as occupationally nondisabling. There being an admitted functional impairment, the board was required to assign to it some percentage of occupational disability. *Griffin v. Booth Memorial Hospital,* Ky., 490 S.W.2d 736, 737 (1973). We find no fault in its having fixed it at 10%.

■ When a person who already has a permanent functional impairment,[2] whatever may be its origin, suffers a compensable injury, in that the injury itself causes some degree of occupational disability, KRS 342.-120 requires an apportionment. The percentage of occupational disability pre-existing the injury is noncompensable. KRS 342.120(4). In this case the board has fixed that figure at 10%. The employer's liability is limited to the percentage of occupational disability that would have resulted from the injury alone had there been no pre-existing functional impairment. KRS 342.120(3). The board failed to determine that figure, so upon remand of the proceeding it must do so. The Special Fund is liable for the percentage of disability in excess of the portion that is noncompensable and the portion for which the employer is liable. KRS

342.120(3) and (4); *Young v. Campbell,* Ky., 459 S.W.2d 781, 785 (1970); *Young v. Young,* Ky., 460 S.W.2d 832, 836 (1970); *Young v. Fulkerson,* Ky., 463 S.W.2d 118, 120 (1971).

The instance in which a pre-existing functional impairment consists of a lost or useless eye presents a classical example of liability on the part of the Special Fund. Although the Fund cannot be charged with the degree of disability existing prior to the injury, any disabling injury to or loss of the remaining eye is bound to result in greater disability than would be the case if the injured party had two useful eyes. For example, we see in this case that the absence of one eye is equated by the doctors with a 25% to 30% functional impairment, and even less from an occupational standpoint. That assessment assumes, of course, the existence of another good eye. Obviously, however, loss of the remaining eye would leave the injured party totally disabled, and the resulting 100% disability would far exceed the sum of the pre-existing disability and the portion to which the employer's liability is limited. For this excess the statute places liability on the Special Fund.

The board erred not only in finding total disability, but also in failing to apportion the allowable compensation between the employer and the Special Fund. Upon remand it should be directed (1) to reconsider and redetermine the degree of occupational disability attributable to a combination of the pre-existing physical disability and the injury, (2) to determine the degree of permanent occupational disability that would have resulted from the injury to the left eye had there been nothing wrong with right eye, (3) to assess liability against the employer for the portion fixed in step (2), and (4) to assess liability against the Special Fund for the total percentage of permanent disability determined in step (1) minus the percentage determined in step (2) and the

---

**2.** Sometimes called an "active" disability to distinguish it from a latent or "dormant" condition which, of itself, has not thus far created

any physical impairment in terms of his ability to work.

10% heretofore determined as pre-existing disability.

One thing more needs to be said. Both of the physicians who testified in this case evidently are competent and reputable specialists. Dr. Burke was not interrogated as to how the slight scarring in the cornea of the eye could have impaired the vision to the extent of a 25% loss in that eye. Nor was he recalled for further explanatory testimony after Dr. Schiller had testified.

We are simply confounded that such a contradiction over the effect of a simple, uncomplicated injury should be left in the record unpursued and unexplained. It is almost as if one doctor said the claimant lost a leg and the other found it still there. There has to be a better way to find the truth than to leave it at that. In future instances of the kind, if the lawyers do not have the time or gumption to dust out the cobwebs the board of its own initiative should call in further medical evidence.

The judgment is affirmed in part and reversed in part with directions that the cause be remanded to the Workmen's Compensation Board for further proceedings consistent with this opinion.

All concur.